# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| LYNN ROWELL, et al. | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| KEN PAXTON, in his official capacity as | § | Civil Action No. 1:14-cv-000190-LY |
| Attorney General of the State of Texas, | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND FOR A PERMANENT INJUNCTION

DEEPAK GUPTA
JONATHAN E. TAYLOR
DANIEL TOWNSEND
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington DC 20036
(202) 888-1741
(202) 888-7792 (fax)
*deepak@guptawessler.com*

RICHARD L. COFFMAN
THE COFFMAN LAW FIRM
First City Building
505 Orleans St., Fifth Floor
Beaumont, TX 77701
(409) 833-7700
*rcoffman@coffmanlawfirm.com*

January 31, 2018                    *Counsel for Plaintiffs*

## TABLE OF CONTENTS

Introduction ................................................................................................. 1

Background and statement of facts ............................................................ 3

    A.    The communicative difference between "surcharges" and "discounts" ............................................................................... 3

    B.    The history of no-surcharge rules ................................................ 4

    C.    Texas ramps up enforcement of its no-surcharge law ...................... 7

    D.    The plaintiffs .............................................................................. 8

    E.    This litigation ............................................................................ 9

Argument ................................................................................................. 10

    Texas's no-surcharge law violates the First Amendment............................ 10

        A.    The plaintiffs' intended speech concerns lawful activity and is not misleading. ............................................................ 11

        B.    Texas has no legitimate interest in obscuring the cost of credit from consumers ....................................................... 12

        C.    Texas's surcharge law does not directly advance any legitimate interests, and many alternatives exist that would not restrict commercial speech. ................................... 14

            1.    Protecting consumers from surprise............................. 15

            2.    Promoting commerce by encouraging the use of credit cards................................................................ 16

            3.    Protecting disadvantaged consumer groups. ................. 17

            4.    Preventing merchants from reaping "windfall profits." ..................................................................... 18

Conclusion .............................................................................................. 20

## INTRODUCTION

This is a First Amendment challenge to a Texas statute, here on remand from the U.S. Supreme Court. Last year, the Supreme Court granted our petition for certiorari, reversed the decision of the Fifth Circuit, and remanded this case for reconsideration. *See Rowell v. Pettijohn*, 137 S. Ct. 1431 (2017). The Fifth Circuit, in turn, sent the case back to this Court for a do-over. *See Rowell v. Pettijohn*, 865 F.3d 237 (5th Cir. 2017).

Until the Supreme Court weighed in, the State of Texas had put all its eggs in one basket: It steadfastly maintained that its "no-surcharge" law—which bans credit-card "surcharges" but allows cash "discounts"—regulates only conduct and is hence immune from First Amendment scrutiny. But that argument has no continuing force. The Supreme Court has unanimously and squarely held that New York's indistinguishable statute "regulates speech" and must "survive[] First Amendment scrutiny." *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151 (2017). Texas has therefore lost its primary defense in this litigation.

Stripped of the ability to deny that First Amendment scrutiny applies, the state is left to defend its speech restriction under the demanding standards of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980). It must show that its law "directly advances" a "substantial governmental interest" that "could not be served as well by a more limited restriction on commercial speech." *Id.* at 569. Texas's burden is "heavy," *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996), requiring actual evidence, not speculation and conjecture. *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).

But Texas has not—and cannot—meet that burden here. At this point, no-surcharge laws have been challenged in four states. They have been considered by 29 federal judges, including eight Supreme Court Justices. A handful of those judges previously upheld the laws on the now-

foreclosed grounds that they regulate conduct, not speech. But not one judge has concluded, after meaningful analysis, that the laws could pass muster under *Central Hudson*.

Instead, every court to analyze the issue—including a unanimous Ninth Circuit panel earlier this month—has reached the same conclusion: no-surcharge laws cannot survive First Amendment scrutiny. *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176–79 (9th Cir. 2018) ("We fail to see how a law that keeps truthful price information from customers increases the accuracy of information in the marketplace."); *Dana's R.R. Supply v. Atty. Gen, Fla.*, 807 F.3d 1235, 1249–51 (11th Cir. 2015) ("Turning to the commercial-speech analysis, we make short shrift of Florida's no-surcharge law."); *Jang v. Asset Campus Housing, Inc.*, No. 15–cv–01067, 2017 WL 2416376 (C.D. Cal. May 18, 2017) (holding that California's law fails each prong of *Central Hudson*); *Italian Colors Rest. v. Harris*, 99 F. Supp. 3d at 1209–10 (same); *Expressions Hair Design v. Schneiderman*, 975 F.Supp.2d 430, 445–48 (S.D.N.Y. 2013) (same for New York's law). And the courts have also generally agreed on why: the interests asserted by the laws' defenders are mainly flimsy and pretextual, and the laws are poorly tailored to advance whatever legitimate interests might be at stake. *See, e.g.*, *Italian Colors*, 878 F.3d at 1177–78; *Dana's R.R. Supply*, 807 F.3d at 1249–51.[1]

Texas cannot escape this growing consensus. Its surcharge statute is identical in all material respects to the California and Florida laws that have been struck down. *Compare* Tex. Bus. & Comm. Code § 604A.0021 *with* Cal. Civ. Code § 1748.1 *and* Fla. Stat. Ann. § 501.0117. As the Eleventh Circuit held in striking down Florida's virtually identical surcharge ban, Texas's no-surcharge law likewise "crumbles under any level of heightened First Amendment scrutiny." *Dana's R.R. Supply*, 807 F.3d at 1238.

---

[1]For the Court's convenience, copies of these decisions are all set forth in the appendix to this brief.

## BACKGROUND AND STATEMENT OF FACTS

American merchants pay some of the highest swipe fees in the world—around 3% of every credit-card transaction. *See, e.g.*, App. 121 ¶ 3. This amounts to well over $50 billion a year. 156 Cong. Rec. S4839 (daily ed. June 10, 2010). The main reason these fees are so high is that they have been kept hidden from consumers—the very people who decide which payment method to use and thus determine whether a fee will be incurred in the first place. As Federal Reserve economists have noted: "What most consumers do not know is that their decision to pay by credit card involves merchant fees, retail price increases, a nontrivial transfer of income from cash to card payers, and consequently a transfer from low-income to high-income consumers." Schuh, Shy, & Stavins, *Who Gains and Who Loses from Credit Card Payments?*, Federal Reserve Bank of Boston, at 1 (2010). Merchants cannot effectively communicate the cost of credit because the credit-card companies have succeeded in insisting that any price difference be labeled as a "discount" for cash rather than a "surcharge" on credit.

## A.   The communicative difference between "surcharges" and "discounts"

A "surcharge" on credit and a "discount" for cash "are different frames for presenting the same price information—a price difference between two things." Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1351−52 (2008). They are identical in every way except one: the *label* that the merchant uses to communicate the difference.

But labels matter. Because of a well-established cognitive phenomenon, many "people have stronger reactions to losses and penalties than to gains" and thus "react very differently to surcharges and discounts," even though they present the same pricing information. Adam J. Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 Berkeley Bus. L.J. 265, 280 (2006). Many consumers are more likely to respond to

surcharges (which are perceived as *losses* for using credit) than to discounts (which are perceived as *gains* for not using credit). *Id.* Research shows just how wide this gap is. In one study, 74% of consumers had a negative reaction to credit surcharges, while fewer than half had a negative reaction to cash discounts. *Id.* at 280–81. That difference—the difference in how the same pricing information is understood by consumers—influences their behavior, making "surcharges" more effective at communicating the costs of credit to consumers. *Id.*

## B.    The history of no-surcharge rules

The effectiveness of surcharges is why credit-card companies have long opposed them. *See* App. 176–78 (describing the history of credit-card companies' lobbying efforts for no-surcharge laws). In the early days of credit cards, credit-card companies' strategy did not involve regulating speech. At first, the companies simply banned any attempt at differential pricing between credit and cash in their contracts with merchants. *See* Kitch, *The Framing Hypothesis: Is It Supported by Credit Card Issuer Opposition to a Surcharge on a Cash Price?*, 6 J.L. Econ. & Org. 217, 219–20 (1991). That changed in 1974 when two things happened: (1) American Express agreed to drop its contractual ban on differential pricing in response to a federal antitrust lawsuit brought by Consumers Union, *id.* at 225, and (2) Congress then enacted legislation protecting the right of merchants to have dual-pricing systems, amending the Truth in Lending Act to provide that "a card issuer may not, by contract, or otherwise, prohibit any such seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Pub. L. No. 93, § 495, 88 Stat. 1500 (1974) (codified at 15 U.S.C. § 1666f(a)).

Only then did the credit-card industry, seizing on Congress's use of the word "discount," shift its focus to the way merchants could label and describe credit pricing to consumers. Aware that how information is presented to consumers can have a huge impact on their behavior—and that many merchants would avoid dual pricing altogether if "surcharges" were outlawed—the

4

credit-card lobby "insist[ed] that any price difference between cash and credit purchases should be labeled a cash discount rather than a credit card surcharge." Tversky & Kahneman, *Rational Choice and the Framing of Decisions*, 59 J. Bus. S251, S261 (1986); *see also* Thaler, *Toward a Positive Theory of Consumer Choice*, 1 J. Econ. Behavior & Org. 39, 45 (1980) ("[T]he credit card lobby turned its attention to form rather than substance," insisting "that any difference between cash and credit card customers take the form of a cash discount rather than a credit card surcharge.").

For a while, this intensive lobbying paid off. In 1976, Congress enacted a temporary ban on credit-card surcharges, but not cash discounts. *See* Pub. L. No. 94–222, 90 Stat. 197; App. 294–95. But by the early 1980s, opposition to the ban intensified as the Reagan Administration, consumer groups, and retailers all urged Congress to let it lapse.

A few examples: A member of the Federal Reserve Board, which unanimously opposed the ban, testified about "the obvious difficulty in drawing a clear economic distinction between a permitted discount and a prohibited surcharge." App. 299 "If you just change the wording a little bit," she explained, "one becomes the other." App. 302. The Board thus proposed "a very simple rule": that both surcharges and discounts be allowed, and "that the availability of the discount or surcharge be disclosed to consumers." App. 300. President Reagan's FTC chairman agreed, observing that "a discount and a surcharge are equivalent concepts." App. 321. So did the major consumer-advocacy groups, including Consumers Union, which explained that the difference between surcharges and discounts "is merely one of semantics, and not of substance." App. 318. But "the semantic differences are significant," the Consumers Union representative testified, because "the term 'surcharge' makes credit card customers particularly aware that they are paying an extra charge," whereas "the discount system suggests that consumers are getting a bargain, and

downplays the truth." *Id.* In 1984, Congress let the ban on surcharges lapse. Levitin, *Priceless?*, 55 UCLA L. Rev. at 1381.[2]

The credit-card companies then turned to the states, convincing fewer than a dozen (including Texas) to enact no-surcharge laws of their own. To create the illusion of grassroots support for these laws, American Express and Visa created and bankrolled a fake consumer group called "Consumers Against Penalty Surcharges." App. 323. In Texas, a group calling itself "Association to Ban Surcharges on Credit Cards" suddenly emerged and hired a former Speaker of the Texas House of Representatives, Bill Clayton, to lobby in support of the law. App. 325. Shortly thereafter, in 1985, the no-surcharge law was enacted.

Around the same time, the major credit-card companies "began including contractual no-surcharge provisions in their agreements with retailers." *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430, 439 (S.D.N.Y. 2013). These private no-surcharge rules remained in effect until 2013, when Visa and MasterCard rescinded them in response to major federal antitrust litigation, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 986 F. Supp.2d 207 (E.D.N.Y. 2013), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016), and American Express agreed to do the same, *In re American Express Anti-Steering Rules Antitrust Litig.*, No. 11-MD-2221 (E.D.N.Y.), ECF No. 306. As a result, state no-surcharge laws like Texas's—previously largely redundant—suddenly sprang to life.

---

[2] On the other side of the debate, American Express and MasterCard "wholeheartedly" and "strongly" supported the ban, even though they understood that, from a "mathematical viewpoint," "there is really no difference between a discount for cash and a surcharge for credit card use." App. 307, 310. And the big banks, like the credit-card giants, supported treating "surcharges" and "discounts" differently because a surcharge "makes a negative statement about the card to the consumer." App. 304. Surcharges, a banking lobbyist openly explained, "talk against the credit industry." App. 315.

## C.      Texas ramps up enforcement of its no-surcharge law

After the major credit-card networks were forced to rescind their illegal surcharge bans, Texas took steps to expand enforcement of its own ban. Before 2013, the Texas Finance Commission had exclusive authority to enforce section 604A.0021.[3] But that commission is only a governing body that oversees three Texas agencies (including the OCCC); it has no investigative staff or legal department to conduct enforcement proceedings. To facilitate active enforcement of the law, the legislature initially transferred authority to the OCCC, effective September 1, 2013. *See* 2013 Tex. Sess. Law Serv. Ch. 63 (H.B. 2548). OCCC began to enforce the law against merchants across the state who express the costs of credit to their customers in the wrong way. For instance, OCCC sent a letter in 2013 to a merchant in response to a complaint that the merchant "tells customers if paying with credit card its [sic] 3% more." App. 327. The OCCC demanded that the merchant "[c]ease this practice for all future services as it appears to be in conflict with [the no-surcharge law]." *Id.*

In 2017, the legislature expanded the number of entities that could enforce the no-surcharge law, eliminating the prior provision that gave the OCCC exclusive enforcement authority. *See* 2017 Tex. Sess. Law Serv. Ch. 196 (S.B. 560), § 9, eff. Sept. 1, 2017; Tex. Bus. & Comm. Code § 604A.0021. Now enforcement actions may be brought by "[t]he attorney general or the prosecuting attorney in the county in which the violation occurs." Tex. Bus. & Comm. Code § 604A.003(a).

---

[3] In September of 2017, the Texas legislature redesignated Texas's surcharge ban from Tex. Fin. Code § 339.001 to Tex. Bus. & Comm. Code § 604A.0021. For simplicity's sake, this motion refers to the law as section 604A.0021 throughout.

### D.     The plaintiffs

The plaintiffs in this case are Texas merchants who seek to use surcharges for the same reason the credit-card industry has long opposed them (first through an outright ban on dual pricing, and then through a speech code): because surcharges most effectively communicate the costs of credit to consumers, and thus most effectively alter behavior. The plaintiffs' declarations bear this out. *See* App. 114–23. Beaumont Greenery, for instance, sought to put up a sign telling customers that it charges an "extra fee" for credit-card transactions until its owner, Lynn Rowell, learned that this speech would violate Texas law. And while Mr. Rowell now understands that he may lawfully tell customers that he offers a mathematically equivalent cash "discount," he does not want to say that. App. 114–16. What he wants to say is that credit costs *extra*—not that cash costs *less*—and to use that framing to persuade consumers to switch to cheaper payment forms. Specifically, he "would like to prominently and conspicuously display the exact amount of the surcharge, expressed as a percentage of the total price. (For example, a sign stating "A 3% surcharge will be assessed for every credit card purchase."). *Id.* at ¶ 8. He "would ensure that customers receive this information both before and after they learn the cash prices of specific sales items, and not only at the point of sale." *Id.* But that speech is exactly what section 604A.0021 prohibits.

The other plaintiffs are in the same boat. *See* App. 118–23. They do not want to express the credit-card price as the "regular price" and the cash price as a "discounted price" because they believe that is an ineffective way to communicate their message. Instead, as Paula Cook and Shonda Townsley explain, they want to explain to customers that they must pay an extra fee for using credit cards. *See* App. 119–20, 122. That is the open and honest messaging that the plaintiffs wish to convey. But because section 604A.0021 outlaws that messaging, they have decided to refrain from dual pricing entirely.

### E.     This litigation

The plaintiffs brought this suit in March 2014, challenging Texas's enforcement of the law as a violation of their First Amendment rights. *See* ECF No. 1. Initially, plaintiffs sought a preliminary injunction, ECF No. 32, while the state moved to dismiss. ECF No. 46. After a hearing, this Court rejected plaintiffs' argument that Texas's law regulated speech and granted Texas's motion to dismiss. ECF No. 55. On appeal, a divided panel of the Fifth Circuit affirmed this Court's ruling. *Rowell v. Pettijohn*, 816 F.3d 73 (5th Cir. 2016), *judgment vacated*, 137 S. Ct. 1431 (2017). Judge Dennis, in dissent, said: "I cannot see how such a restriction [on speech] can avoid First Amendment scrutiny. Nor can I see how such a restriction can survive it." *Id.* at 86.

Meanwhile, a series of nearly identical statutory challenges were proceeding in a number of cases throughout the country. *See, e.g.*, *Dana's R.R. Supply v. Attorney General, Florida*, 807 F.3d 1237 (11th Cir. 2015); *Italian Colors Rest. v. Harris*, 99 F.Supp.3d 1199 (E.D. Cal. 2015). After the Fifth Circuit held that no-surcharge laws do not regulate speech, the U.S. Supreme Court reached the opposite conclusion. In *Expressions Hair Design v. Schneiderman*, the Court held that the analogous no-surcharge statute in New York restricted "how sellers may communicate their prices," and therefore concluded that it "regulate[d] speech" and must be subject to First Amendment scrutiny. 137 S. Ct. 1144, 1151 (2017).

The Supreme Court's decision left intact only one decision on no-surcharge laws—the Eleventh Circuit's ruling striking down Florida's law. *See Dana's R.R. Supply*, 807 F.3d 1237. In contrast, the Supreme Court vacated the Fifth Circuit's ruling in this case and remanded for reconsideration in light of its ruling in *Expressions*. *See Rowell v. Pettijohn*, 137 S. Ct. 1431 (2017). The Fifth Circuit, in turn, remanded the case to this Court "for further proceedings consistent with" *Expressions*. 865 F.3d 237 (2017). After a brief period of discovery, the plaintiffs now move for summary judgment.

**ARGUMENT**

**Texas's no-surcharge law violates the First Amendment.**

The Supreme Court made clear in *Expressions* that Texas's law must survive First Amendment scrutiny to be upheld. 137 S. Ct. at 1151. Every court to meaningfully consider the issue has reached the same conclusion: no-surcharge laws like Texas's do not survive under the standards governing commercial-speech regulations. *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176–79 (9th Cir. 2018); *Dana's R.R. Supply*, 807 F.3d at 1249–51; *Italian Colors Rest. v. Harris*, 99 F. Supp. 3d at 1209–10; *Expressions*, 975 F. Supp. 2d at 445–48.

This case is no different. As "[t]he party seeking to uphold a restriction on commercial speech," Texas "carries the burden of justifying" its law. *Am. Academy of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017). Texas's no-surcharge statute is the same in all relevant respects to the ones in California and Florida that have been struck down. *Compare* Tex. Bus. & Comm. Code § 604A.0021 *with* Cal. Civ. Code § 1748.1 *and* Fla. Stat. Ann. § 501.0117. And the state's prior briefing in this case rested almost entirely on its contention that the law need not satisfy any scrutiny because the First Amendment does not apply. *See, e.g.*, ECF Nos. 31, 42. Because the Supreme Court has now entirely foreclosed that argument, the state must attempt to defend its speech restriction under the demanding standards of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980). It cannot succeed.

*Central Hudson* instructs courts to ask four questions to determine whether the government has met its burden to justify a commercial-speech regulation: (1) whether the speech "concern[s] lawful activity and [is] not . . . misleading"; (2) "whether the asserted governmental interest" justifying the regulation "is substantial"; (3) "whether the regulation directly advances the governmental interest asserted"; and (4) whether the regulation is "more extensive than is necessary

to serve that interest." *Id.* at 566. The government's burden is "heavy," requiring actual evidence, not speculation and conjecture, that each *Central Hudson* factor is satisfied. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996); *see Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). Texas cannot meet this burden at any step along the way.

### A.  The plaintiffs' intended speech concerns lawful activity and is not misleading.

The speech that the plaintiffs wish to engage in "is neither misleading nor related to unlawful activity." *Pruett v. Harris Cnty. Bail Bond Bd.*, 499 F.3d 403, 409 (5th Cir. 2007).

First, the speech is related to lawful activity. As this Court noted, and as no party disputes, Texas's statute permits "lawful dual pricing"—merchants may charge less for cash and more for credit. ECF No. 55 at 5 & n.3. The law, in other words, "tells merchants nothing about the amount they are allowed to collect from a cash or credit card payer." *Expressions*, 137 S. Ct. at 1151. To the extent the plaintiffs' speech is related to any activity, then, it is the lawful activity of a merchant choosing to set its own prices. *See Italian Colors Rest.*, 878 F.3d at 1176 ("It is obvious that the activity to which plaintiffs' desired speech is directed—charging credit card users more than cash users— is not unlawful.").

Second, the plaintiffs' speech is not misleading. To paraphrase the Ninth and Eleventh Circuits, characterizing the additional amount paid by a credit-card user as a "surcharge" rather than a "discount" is no more misleading than calling the weather "warmer in McAllen" rather than "cooler in Amarillo." *Cf. Dana's R.R. Supply*, 807 F.3d at 1249; *Italian Colors*, 878 F.3d at 1176. Far from trying to mislead their customers, the plaintiffs seek to *inform* them. They want to communicate their pricing systems "prominently and conspicuously"—for example, through signs saying that "[a] 3% surcharge will be assessed for every credit card purchase." App. 115–16 ¶ 8. And they want to say *why* the surcharge will be assessed: because of swipe fees. *Id.* ¶ 10; *see*

11

*Expressions*, 137 S. Ct. at 1148 ("They also want to make clear that they are not the bad guys—that the credit card companies, not the merchants, are responsible for the higher prices."). That is not remotely misleading. It is the opposite.

### B.    Texas has no legitimate interest in obscuring the cost of credit from consumers

Texas cannot justify its law by asserting interests that require keeping consumers in the dark. The First Amendment protects commercial speech because of the public interest in the "free flow of commercial information." *Va. Bd. of Pharmacy*, 425 U.S. at 765. The free flow of information is necessary to foster "intelligent and well informed" economic decisions by consumers, specifically with respect to "price information." *Id.* States may not, in contrast, pass laws that seek to "diminish the effectiveness" of communication because the state has determined that certain true, non-misleading speech is undesirable. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). "Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects," *id.* at 577, so courts must "be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good," *44 Liquormart*, 517 U.S. at 503 (plurality op.); *see also Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 167 (5th Cir. 2007).[4]

Texas ignores this underlying rationale for commercial-speech protections. In this case and elsewhere, Texas has repeatedly asserted interests that depend on the premise that states may legislate to protect consumers from the decisions they would make if given truthful, non-misleading

---

[4] Some Justices have expressed the view that such laws are always unconstitutional. *See 44 Liquormart*, 517 U.S. at 518 (Thomas, J., concurring) ("[When] the government's asserted interest is to keep legal users of a product or service ignorant in order to manipulate their choices in the marketplace," that "is *per se* illegitimate."); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 497 (1995) (Stevens, J., concurring) ("[T]he Government's asserted interest, that consumers should be misled or uninformed for their own protection, does not suffice to justify restrictions on protected speech in *any* context.").

information. Take, for instance, the analysis provided by Texas's own expert, Dr. Ashwani Monga. Dr. Monga writes that, when consumers pay a surcharge, it "seems more painful" than forgoing an equivalent discount and "feels much more severe." App. 356. This "pain," in turn, "may lead to perceptions of unfairness." *Id.* Texas's law therefore "improves consumer welfare by reducing the pain of payment and making prices seem fairer." *Id.* It is hard to think of a more direct assertion that a law is designed "to keep people in the dark for what the government perceives to be their own good." *44 Liquormart*, 517 U.S. at 503 (plurality op.). Under Dr. Monga's analysis, the problem with depicting a higher price as a surcharge is not that it's misleading—it's that the truth hurts.

Similarly, the expert report by Steven Semeraro is built around an argument that depends on keeping consumers in the dark. Semeraro says that when merchants apply a "surcharge" for credit-card use, it "increases the costs for consumers who choose to use credit cards" and therefore "will reduce their demand for goods and services." App. 378. That reduced demand, Semeraro argues, will cause merchants to raise prices, which will lower consumer welfare. *Id.* But greater transparency *decreases* costs. When customers are made aware of the costs that are incurred by their credit-card use, that enables "genuine competition between payment forms," which can "driv[e] down swipe fees for everyone." App. 235. As one national consumer-advocacy organization put it, "the most likely and significant outcome of allowing merchants to surcharge is decreased swipe fees." App. 236. In Australia, for instance, "the average swipe fee fell by nearly half" after merchants were permitted to surcharge. *Id.* These "resulting lower retail prices should naturally stimulate *more* consumer spending," not less, as Semeraro argues. App. 241.

These experts' arguments cannot justify a restriction on commercial speech under *Central Hudson*. "Consumers benefit from more, rather than less, information. Attempting to control the outcome of the consumer decisions . . . by restricting lawful commercial speech is not an appropriate way to advance a state interest in protecting consumers." *Allstate Ins. Co. v. Abbott*, 495

F.3d 151, 167 (5th Cir. 2007) (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002)). Texas's experts turn that principle on its head, arguing that the "surcharge" label will be inherently injurious to consumers and cause them to act in ways that raise prices. But fear that "the public will respond 'irrationally' to the truth," or "would make bad decisions if given truthful information," is no justification for a speech ban. *Thompson*, 535 U.S. at 374–75 (quotation marks omitted). It is for "the speaker and the audience, not the government, [to] assess the value of the information provided." *Edenfield*, 507 U.S. at 767. Interests that rely on keeping the public in the dark are not even permissible, let alone "substantial." *Central Hudson*, 447 U.S. at 566.

## C.   Texas's surcharge law does not directly advance any legitimate interests, and many alternatives exist that would not restrict commercial speech.

Texas's remaining justifications cannot withstand *Central Hudson* scrutiny either. For each asserted interest, Texas has the burden "to demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994). But Texas offers only scant evidence, based primarily on "speculation or conjecture." *Edenfield*, 507 at 770–71. And even if it were to substantiate these interests, the breadth of the no-surcharge law, combined with the state's decision to exempt itself and its municipalities, make it impossible for Texas to show that "the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993).

Texas's experts in this case and its advocacy elsewhere suggest four general interests its law could advance: (1) protecting consumers from surprise; (2) promoting commerce by encouraging the credit-card use; (3) protecting disadvantaged consumer groups in particular; and (4) preventing merchants from reaping "windfall profits." Each of these potential justifications—which have been rejected by every court to scrutinize them—dissolves on inspection.

14

**1. Protecting consumers from surprise.** In *Expressions*, Texas signed on to an amicus brief in the Supreme Court arguing that surcharge laws "protect consumers from surprise." App. 265. The brief claims that these laws prevent a "bait-and-switch" in which consumers see one price in an advertisement or on a shelf but pay a higher price at the point of sale. App. 265–67 (citing Sponsor's Statement of Intent, S.B. 641, 84th Leg., R.S. (Tex. 2015)). And, the brief argues, preventing consumer surprise also facilitates price comparisons by making sure consumers know that the price they pay will not be higher than the price they initially see when comparing products. App. 267–70.

The problem with this argument, which was rejected by both the Ninth and Eleventh Circuits, is that there is "no reasonable fit" between the goal of preventing unfair surprise and the means Texas has chosen. *Italian Colors*, 878 F.3d at 1178; *see also Dana's R.R.*, 807 F.3d at 1250. We agree that merchants should not impose an undisclosed surcharge or surprise consumers by waiting until the point of sale to inform them of a surcharge. But that is not what the plaintiffs here want to do, and it is clear that the state did not need to enact a new law to prevent that sort of deception. Texas already has laws prohibiting deceptive acts and practice. *See, e.g.*, Tex. Bus. & Comm. Code § 17.46. Because the state could address any legitimate concern about consumer deception simply by enforcing its existing laws, the no-surcharge law is unnecessary. *See BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 508 (6th Cir. 2008) (Sutton, J.) ("Even granting the Commonwealth's assumption that [consumer deception] was a potential problem, . . . why not first enforce existing state law on the point?").

Even if Texas didn't already have such a law, its no-surcharge law would still go too far. If Texas had wanted to prevent consumer surprise, it "could simply ban deceptive or misleading surcharges . . . [or] require retailers to disclose their surcharges both before and at the point of sale, as Minnesota does." *Italian Colors*, 878 F.3d at 1178. If Texas wanted to facilitate price comparisons,

15

or just make sure consumers pay what they expect to pay, it "could simply prohibit dual-pricing altogether." *Dana's R.R.*, 807 F.3d at 1250. As the Eleventh Circuit noted, the less-strict alternatives available "are legion." *Id.* But Texas regulates all speech framed as a surcharge, no matter how truthful and non-misleading.

"States may not place an absolute prohibition" on information that is merely "potentially misleading . . . if the information also may be presented in a way that is not deceptive," as it can be here. *In re R.M.J.*, 455 U.S. 191, 203 (1982). The plaintiffs here are clear that they want to display signs "prominently," to "ensure that customers receive" the relevant information "both before and after they learn the cash prices of specific sales items, and not only at the point of sale." App. 115–16 ¶ 8. Texas may not ban this clear, truthful, and informative speech when the alternatives are legion. *R.M.J.*, 455 U.S. at 203.

**2. Promoting commerce by encouraging the use of credit cards.** Texas also submits expert testimony contending that its no-surcharge law promotes commerce. Both Dr. Monga and Mr. Semeraro say that the perceived additional cost to using a credit card would discourage credit card use to some degree. App. 357, 376–77. Dr. Monga states that increasing the "pain" consumers feel when using credit cards "would impede commerce." App. 356–57. Semeraro theorizes that merchants "would not have the information necessary to set an efficient price" for surcharges, resulting in an overall negative impact on commerce. App. 379–80.

This argument—that giving consumers accurate information about the cost of their behavior will drive up the costs they pay—flies in the face of both basic economic reasoning and lived experience. If merchants begin surcharging for credit-card use, consumers have several natural responses: "find a different, cheaper card, use another, cheaper, payment method, or even take their business to a merchant that does not surcharge." App. 185. Transparency "would bring market pressure to bear" on credit-card swipe fees, "and would result in their decline." *Id.* In other

words, "the invisible forces of the market would foster price-reducing competition among merchants and credit-card companies alike." *Id.* Dr. Monga's and Mr. Semeraro's assertions that consumers will spend less is much less plausible given the availability of these cheaper alternatives, many of which—for instance, using a cheaper credit card—would be indistinguishable in terms of the convenience offered to consumers. And the downward pressure that transparency would exert on swipe fees may well mean that many consumers will spend less, not more, in their transactions.

Neither Dr. Monga nor Mr. Semeraro provides any empirical evidence of surcharges resulting in decreased commerce. This alone is enough to hold that Texas has not met its burden under the *Central Hudson* test, which requires actual evidence, not speculation and conjecture, to satisfy each factor. *Edenfield*, 507 U.S. at 770–71. But in addition to this shortcoming, the Australian experience in the early 2000s demonstrates that allowing surcharges will actually *reduce* the cost of credit cards to consumers and merchants. *See* App. 186. When Australia began permitting merchants to surcharge in 2003, swipe fees "fell dramatically." *Id.* Fees for Mastercard and Visa fell by 46%, and fees for American Express fell by 33%. *Id.* Swipe fees in the United States are currently the highest in the world, with merchants and consumers paying around 50 billion dollars per year to credit card issuers. App. 227. It is hard to imagine how giving between one-third and one-half of that money back to consumers and merchants would result in higher prices, less shopping, and lower welfare.

**3. Protecting disadvantaged consumer groups.** Texas's *Expressions* amicus brief also asserts that laws like Texas's help to protect low-income consumers and families who use credit cards. App. 268–69. To say that Texas's law is poorly tailored to achieve this goal would be an understatement. As the plaintiffs attest, merchants who cannot recoup swipe fees via surcharges are forced to raise their prices across the board. *See* App. 114–15; App. 118–19; App. 121–22; *see also* App. 139. This effectively results in a redistribution of wealth from those who pay with cash to

17

those who pay with credit. And because credit-card users are usually more affluent members of society, this redistribution in effect means that "consumers using food stamps or receiving welfare payments may find themselves subsidizing first-class upgrades and spa vacations for affluent rewards card users." App. 188.

**4. Preventing merchants from reaping "windfall profits."** Finally, Texas's *Expressions* amicus brief argues that anti-surcharge laws prevent merchants from gaining "windfall profits" by charging consumers "twice for the [same] fee." App. 267–68. According to the brief, because "[m]ost sellers have already incorporated swipe fees into their regular prices," without a law prohibiting surcharges they could simply add surcharges on top of those prices, resulting in a double charge. *Id.* This is a strange criticism. Merchants are already permitted, in most cases, to set whatever prices they want. The only force preventing "windfall profits" is market competition— which would be just as present if surcharges are enabled. And as the empirical evidence just discussed illustrates, market competition will result in lower swipe fees for consumers.[5] Finally, if windfall profits are a concern, it would be simple for Texas to simply pass a law setting a cap on the permissible surcharge amount, as Minnesota has done. *See* App. 243 (citing Minn. Stat. Ann. § 325G.051(1)(a)).

In addition to these specific flaws, each of the potential justifications for Texas's statute is further undermined by the fact that the statute contains a "broad swath of exemptions." *Italian*

---

[5] Texas's amicus brief cites a law-review article for the proposition that there was "[a] disproportionate rise in credit-card surcharges in Australia, where surcharges are legal, well above merchants' swipe fees." App. 268. The cited page does not appear to indicate any such "disproportionate rise," and also notes that the Australian experience supports the conclusion that "the no surcharge rule does not promote competition." *See* Richard A. Epstein, *The Regulation of Interchange Fees: Australian Fine-Tuning Gone Awry*, 2005 Colum. Bus. L. Rev. 551, 584 (2005). In any event, a "leading Australian consumer advocacy group" conducted an "exhaustive investigation" in response to concerns about profiteering via surcharges, and "found no actual concrete evidence that profiteering was occurring." App. 183.

*Colors*, 878 F.3d at 1177. The law, by its own terms, "does not apply to a state agency, county, local governmental entity, or other governmental entity that accepts a credit card for the payment of fees, taxes, or other charges." Tex. Bus. & Comm. Code § 604A.0021. This self-serving exemption calls into doubt any potential interest the state may claim. By charging surcharges, is Texas surprising consumers, hindering transactions, taking advantage of disadvantaged groups, and collecting windfall profits? If not, how could it assert that merchants would be doing so when they engage in the same behavior? These "exemptions and inconsistencies bring into question the purpose of the labeling ban." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995). Even if goals like consumer protection are legitimate in the abstract, Texas's no-surcharge law "proves too broad and too blunt a means to its ends." *Dana's R.R.*, 807 F.3d at 1250; *see also Italian Colors*, 878 F.3d at 1178 ("That California exempted itself and its subdivisions from the asserted free market protections of [its no-surcharge law] suggests that this justification is thin.").

*     *     *     *

Texas thus cannot meet its burden under *Central Hudson*. To survive First Amendment scrutiny, Texas must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Ibanez*, 512 U.S. at 146. But Texas's experts offer only loose theorizing, while economic logic and empirical evidence cut in the opposite direction. Texas also must show that "the 'fit' between ends and means is reasonable." *City of Cincinnati*, 507 U.S. at 417 n.13. But for each of the interests Texas asserts, there are "numerous and obvious less-burdensome alternatives to the restriction on commercial speech." *Id.* And Texas's no-surcharge law exempts the state itself from its ambit, "betray[ing] the frailty of any potential state interests." *Dana's R.R.*, 807 F.3d at 1250.

"If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson*, 535 U.S. at 373. As a result, prohibitions on "truthful, nonmisleading

speech about a lawful product . . . rarely survive constitutional review." *44 Liquormart*, 517 U.S. at 504 (plurality op). No-surcharge laws are no exception. Texas's no-surcharge law is not meaningfully different from the ones overturned by federal courts across the country. The state has no legitimate interest in keeping consumers in the dark, and its law is inadequately tailored to any legitimate interests it might wish to pursue. Texas's law therefore cannot withstand the scrutiny required by the First Amendment.

## CONCLUSION

This Court should declare that Tex. Bus. & Comm. Code § 604A.0021 violates the plaintiffs' free-speech rights under the First Amendment and should permanently enjoin the State of Texas from enforcing the statute against them.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
JONATHAN E. TAYLOR
DANIEL TOWNSEND
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
*deepak@guptawessler.com*

RICHARD L. COFFMAN
THE COFFMAN LAW FIRM
First City Building
505 Orleans St., Fifth Floor
Beaumont, TX 77701
(409) 833-7700
*rcoffman@coffmanlawfirm.com*

*Counsel for Plaintiffs*

January 31, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2018, I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta